---

## THE BRIS.

### (District Court, S. D. New York. June 7, 1918.)

1. SHIPPING ⬤⇒145—GOVERNMENTAL INTERFERENCE—PREPAID FREIGHT—RETENTION BY CARRIER.

   Where libelant shipped varnishes upon a steamship, prepaying freight and receiving a bill of lading, releasing carrier from loss through restraint of rulers or people, and providing prepaid freight be considered as earned and retained by carrier, "vessel or cargo lost or not lost," and after loading the United States refused the owner license to ship, the carrier could retain prepaid freight.

2. SHIPPING ⬤⇒145—BILLS OF LADING—EARNED FREIGHT LOSS—PUBLIC POLICY—TIME OF WAR.

   Insertion by shipowner of clause in bill of lading providing that prepaid freight be considered earned on shipment and retained by carrier, "vessel or cargo lost or not lost," is not in contravention of public policy in time of war.

3. SHIPPING ⬤⇒145—BILL OF LADING—CONSIDERATION.

   Where a carrier loaded goods on a vessel for shipment, and freight was prepaid, and carrier was forced to unload the goods through shipper's failure to secure license from the United States, such was not a "commercial frustration of the adventure," constituting failure of consideration.

In Admiralty. Libel by the Standard Varnish Works against the steamship Bris. Libelant's exceptions to claimant's answer overruled, and libel dismissed.

Julius J. Frank, of New York City (Everett P. Wheeler, of New Hamburg, N. Y., of counsel), for libelant.

Haight, Sandford & Smith, of New York City (Charles S. Haight, of New York City, of counsel), for claimant.

KNOX, District Judge. This matter is before the court upon exceptions filed by the libelant to the answer of the claimant herein. The facts appear to be as follows:

Upon August 13, 1917, the libelant shipped upon the steamship Bris, then lying at the port of New York, 100 barrels of varnishes, which the libelant desired to have carried to the port of Gothenburg, Sweden. Upon reaching that port the merchandise was to be delivered to the Allmanna Svenska Elektriska A. B., of Westeras, Sweden. The freight charges upon the shipment amounted to $2,383.33, and upon August 17, 1917, the libelant paid to the agents of the Bris the freight money as agreed upon. There was then issued to the libelant a bill of lading.

This document contained a clause releasing the carrier from liability for loss or damage arising through restraint of princes, rulers,

or people; and it also contained two other clauses pleaded in the answer, and frequently referred to upon the argument and in the briefs as controlling, in a large measure, the decision to be made herein. These clauses so far as they are material read as follows:

"(6) * * * Prepaid freight is to be considered as earned on shipment of the goods and is to be retained by the vessel's owners, vessel or cargo lost or not lost, or if there be a forced interruption or abandonment of the voyage at a port of distress or elsewhere. * * *

"(7) Also in case the ship shall be prevented from reaching her destination by quarantine, blockade, war, ice, unsafe navigation, or the hostile act of any power, or in case blocking up by ice is to be feared, or if the discharging of the goods or any part thereof should be objected to by the authorities, the master or owners may either wait until the navigation is reopened or given free, or discharge the goods into any depot or at any convenient port or bring her cargo back to port of shipment where the ship's responsibility shall cease. This to apply also to goods shipped as through freight beyond the original port of destination of the vessel. In any case the freight and charges are to be paid in full and the shippers and consignees to be responsible for all expenses thereby incurred upon the goods and for demurrage and extra expenses of the vessel to be paid in full along with the freight. * * *

"Owing to conditions of war or hostilities existing or threatened, this shipment is accepted at the sole risk of the owners hereof of arrest, restraint, capture, seizure, detention, or interference of any sort by any Power; and the carrier and its representatives are privileged in its or their absolute discretion, if deemed advisable for the protection of the vessel or any cargo, or to avoid loss, damage, delay, expense, or other disadvantages or danger, either with or without proceeding to or toward the port of discharge, or entering or attempting to enter or discharge the goods there, and whether such entry or discharge be permitted or not, to proceed to any other port or ports or return to the port of shipment, once or oftener in any order or rotation, retaining the goods on board or discharging the same at risk and expense of the owners thereof at any such port or ports at the first or any subsequent call, and full bill of lading freight, together with extra compensation for additional transportation and all other charges, shall be paid by the shipper, consignee, and/or assigns, and shall be a lien on the goods."

At the time this shipment went on board the Bris, there was in force a British system of licensing shipments of goods that were to pass through the war zone. Under the regulations established by Great Britian as to the licensing of shipment of goods from the United States, it was necessary for the exporter to obtain what was called a "navicert," and it was necessary that this navicert should accompany the ship's papers, and, if the same was lacking, the Allies would not permit the shipment to proceed to its destination.

At the time the varnishes for which the freight was paid in this case were delivered to the Bris, the shippers had procured the required license from the British government, and it is admitted that upon the date of delivery to the Bris this license was the only one required. However, upon June 15, 1917 (chapter 30, tit. 7, §§ 1, 2, 40 Stat. 225) an act of Congress of the United States was approved by the President, giving the President authority to regulate exports by proclamation, and imposing penalties of fine and imprisonment for any violation of the act. Thereafter, upon June 22, 1917, July 9, 1917, August 27, 1917, and possibly other dates, proclamations were issued by the President, and various administrative steps were taken, under the provisions of the regulating act of June 15, 1917, until

upon September 18, 1918, the exportation to Sweden of any article of commerce was forbidden, unless a license permitting the article to be exported was procured from the proper authority in the United States.

Some days after the issuance of the President's proclamation of August 27, 1917, which comprehended the shipment in question, the agents of the Bris notified the libelant's agents of the situation as it then existed, and gave formal notice that, unless a license to export the shipment in question was procured on or before September 12, 1917, it would be necessary to discharge the libelant's cargo. Similar notice was given to other shippers whose cargo was on board the Bris.

Owing to the confusion that resulted among shippers by reason of the President's proclamations, and their requirements, and so as to enable the shippers to make appropriate application for licenses, the cargo was not discharged upon September 12th. In the meanwhile libelant made efforts to procure an export license for the varnishes, but was unable to have the same issued. Upon October 2d, the agents again sent a notice to the libelant, and the other shippers of cargo, in which they once more gave formal notice that unless export licenses were received by October 6, 1917, the cargo would be discharged, and upon October 8, 1917, the claimant began the actual discharge of the cargo, and completed the operation about October 22d. About October 11th it was definitely ascertained that no license for the export of the shipment in question would be issued.

The claimant seeks to retain the freight prepaid upon the shipment of the varnishes, upon the theory that it was through no fault of the Bris that the cargo did not go forward, and that under the bill of lading the claimant was entitled to keep the freight paid in advance, in that, under the sixth paragraph of the bill of lading, the prepaid freight was to be considered as earned on shipment, and that under the circumstances herein set out there was no obligation upon the claimant to return the prepaid freight.

It is contended by the libelant: (1) That the articles in the answer to the libel setting forth the foregoing facts are insufficient in law to constitute a defense; (2) that the performance of the contract between the parties became unlawful after the agreement was made, that the consideration therefor failed, and the libelant is entitled to a return of the prepaid freight; (3) that the clauses from the bill of lading hereinbefore set out were without consideration and against the public policy of the United States; (4) that the said clauses, being an attempt to put off the essential duties resting upon every public carrier by virtue of his employment, are accordingly void; (5) that the said clauses are in violation of Harter Act February 13, 1893, c. 105, 27 Stat. 445 (Comp. St. 1916, §§ 8029–8035), and thereby invalid and void.

The naked question before me is, under the circumstances above recited and the bill of lading issued upon the shipment, can the claimant retain the prepaid freight? Fortunately, I am not without a guide in seeking the proper solution of the question. The Circuit

Court of Appeals for this circuit, in the recent case of The Gracie D. Chambers, 253 Fed. 182, —— C. C. A. —— (decided May 22, 1918), and in its facts somewhat similar to these before me, has held in favor of the claimant. Indeed, the facts which justified the decision in favor of the claimant in the Gracie D. Chambers Case appear to me to be less persuasive in supporting the contention of the claimant than do those in the case at bar.

In that case the schooner began to load a general cargo at this port upon September 14, 1917, and between September 27th and September 29th the libelant paper company shipped on board her 120 tons of print paper. Late in the afternoon of September 28th the Treasury Department at Washington telegraphed the collector at the port of New York to withhold clearances of all sailing vessels in port, and any part of whose voyages would bring them within the danger zone. There was no official publication of the embargo, but upon September 29th it was put in effect by the refusal of clearances to such vessels as applied for them. October 3d the Gracie D. Chambers moved out to an anchorage to save wharfage charges and clearance. On October 4th the libelant paid the freight as against the delivery of the bill of lading. On October 5th the master applied for a clearance, which was refused. He then applied to the authorities at Washington to make an exception in this instance, upon the ground that the Gracie D. Chambers had begun to load cargo before the issuance of the embargo order. Upon October 10th the refusal to make an exception in favor of this schooner was definitely made. Cargo was then discharged, and the owners refused to return the prepaid freight. It will be noted, in passing, that the cause which prevented the execution of the contract of the parties in the Gracie D. Chambers Case arose from an infirmity placed upon the schooner by governmental action.

The bill of lading in that case had excepted "restraints of princes and rulers," and also "freight for the said goods to be prepaid in full without discount retained and irrevocably ship and/or cargo lost or not lost." It is said by the libelant in the case before me that the decision in the Gracie D. Chambers Case turned upon the construction of the word "irrevocably" as it was contained in the bill of lading. In other words, that the parties had agreed that the freight should be retained irrevocably, ship and/or cargo lost or not lost. And it is then urged upon me that the bill of lading issued by the agents of the Bris is not the equivalent of that issued by the owners or agents of the Gracie D. Chambers.

[1] It is my judgment that the words, "prepaid freight is to be considered as earned on shipment of the goods and is to be retained by the vessel's owners, vessel or cargo lost or not lost, or if there be a forced interruption or abandonment of the voyage at a port of distress or elsewhere," are for all practical purposes the equivalent of the statement that "freight for the said goods to be prepaid in full without discount retained and irrevocably ship and/or cargo lost or not lost." The effect of the clause in each instance is simply this: That, once the freight money is paid, it is paid for good and may not

be recovered. That this holding, in certain aspects, must appear harsh, goes without saying.

[2] It does not appear to me, however, that under the existing circumstances the insertion by shipowners of such a clause in a bill of lading contravenes any sound public policy, if public policy enters into the case at all. It is my opinion that public policy in any given instance depends largely upon the existent conditions and circumstances at the time the public policy is enunciated. At the time the parties here entered into their contract, they and the world knew the hazard with which shipping was being carried on. They likewise knew that what was permitted upon one day might not be permitted the next. Indeed, by act of Congress and presidential proclamation they were notified that regulations governing, and perhaps forbidding, exports, were likely to be issued at any time, and in the face of this knowledge the libelant delivered his cargo to the Bris and prepaid the freight as against the bill of lading. It is not to be wondered at, therefore, that ship's owners, in view of the demand for cargo space, sought to protect themselves (if lawfully they might do so) as against any contingency that might arise. The infirmity here, unlike the Gracie D. Chambers Case, was in the cargo of the libelant, and not in the Bris.

By reason of the foregoing considerations, the cases cited by the proctors for the libelant upon what has been declared to be the law with respect to the ability of a carrier to limit its responsibilities seem to me not in point. My attention is called to the principle announced in Scrutton on Charter Parties, section 10, article 137, 8th Ed., page 321, where it is said advance freight "will be recoverable (from the shipowner) if the goods are not lost by excepted perils, or if the shipowner has not fulfilled the condition precedent of starting, within a reasonable time, of a seaworthy ship on the agreed voyage." The answer to this must be that, in this litigation, the libelant did not perform the conditions precedent to his being permitted to forward his goods, and it appears to me that the burden of not having done so, even though prevention was through the action of the government, must fall upon it.

Again, it is urged that the provision in the seventh clause of the bill of lading is applicable only to a case where the ship has begun her voyage and is "prevented from reaching her destination." This seems to me not to be a valid contention. The prevention of the voyage, interposed by the government of the United States within this port, was, so far as the shipowners were concerned, just as potent a factor, and operated in their favor to the same extent, as would the act of an enemy power once the ship was on her way.

[3] I am likewise unable to agree with the libelant that there was here a total failure of consideration, and that there was a "commercial frustration of the adventure," by reason whereof the libelant is entitled to prevail. The libelant, under his contract, had space for its cargo. For weeks the owner held the Bris to enable the libelant to get his export license. Indeed, the Bris, had she not shown a disposition to act fairly with the libelant, would have been able to take on

another cargo and complete her voyage during the time she lay idle for the purpose of being in a position to sail for Gothenburg, should the libelant procure its license. The adventure was frustrated because of governmental action, and I shall not hold that a frustration of this character dissolved the contract, notwithstanding that the Bris did not "break ground."

Without entering into a discussion, in an opinion already too long, of my reasons for thinking that the Harter Act (27 Stat. 445) has no application to the case at bar, I shall content myself with the mere assertion that it has none.

The exceptions to the answer to the libel are overruled, and the libel dismissed, with costs.